We have two cases on the docket for this afternoon, and the first case is Appeal No. 2008-5020 SOUTHERN NUCLEAR v. United States. Mr. Haberbach, good afternoon and welcome. Please begin. Thank you, Your Honor. Good afternoon, and please, the Court. This case should be remanded for the same reason that remand was required in Pacific Gas, Yankee Atomic, Carolina Power, and Sacramento Municipal Utility District. And that reason is to permit the trial court to assess damages based upon the rate that this court endorsed in Pacific Gas after the court issued its decision in this matter. Since the rate was set in Pacific Gas... But the court said you would have reached the same result using the 1987 standard? Your Honor, the court did not reach a result at the 1987 rate with respect to both plans, and it also did not employ the methodology that this court required in Yankee Atomic. Keep in mind, the trial court issued its decision in this case before the Yankee Appeal served and before the Yankee case was remanded. The court committed the same methodological error  explicitly with respect to, at least if my memory is correct, with respect to the hatch facility, that he would have reached the same result under the 1987 standard, did he not? No, Your Honor, he did not quite reach that, state that. What the court concluded, and this is important, is that the need for dry storage would have been obviated had the 1987, had the case been tried at the 1987 rate. But what the court did not do and what Yankee Atomic requires is for the court to consider what steps would have been undertaken so as to obviate the need for spent fuel storage at Plant Hatch. And in fact, the court's... So what evidence did you put in that at Plant Hatch there would have been other expenses? Well, Your Honor, the case was not tried at the... The answer is you didn't put in any evidence? Well, we did put in evidence at the 900 rate, which is the rate that the government advocated based upon the 1991 ACR. We put in evidence indicating that at that particular rate, dry storage would in fact have been required. However, the 87 rate is a game changer. Did you put in evidence about additional costs under the 1991 rate? We didn't put in evidence of additional costs because the government's position was that dry storage would have been required at the 1991 rate, such that all of the costs that were incurred for dry storage, with the exception of some additional costs that DOE failed to pick up, would have been purchased and procured and installed in the non-breech world. Because no evidence was put in at the 87 rate, no discovery was taken at the 87 rate, and there was no reason for the parties to have done so because neither party advocated the 87 rate as the controlling rate. The court was never presented with any evidence of what would have happened had DOE accepted fuel in accordance with the rate that it subsequently adopted in Pacific Gas. The plaintiffs say, as I noted, that at the 1987 rate, no dry storage would have been required. But what they don't do is to quote that particular sentence of the trial court's opinion in its decision on the motion for reconsideration, indicating that the basis for its conclusion that the need for dry storage would have been obviated at the 1987 rate was the ability to engage in alternate spent fuel management techniques. And those alternate spent fuel management techniques unquestionably have a price, whether they're reconfiguring the pool, whether it's altering... At that point, did you ask for the opportunity to put in evidence about that? We did not, Your Honor, because at that particular time, the 87 rate hadn't been arrived at by the court, and the government's belief was still that the proper rate was the 900 rate, the rate that we advocated based upon the 1991 ACR. There wasn't any justification or reason for the parties to have tried to retry the case or to try to try the case at a rate that neither party was advocating. And this court's opinion in Yankee makes clear that it's the plaintiff's burden to not only prove what rate is controlling, which didn't happen in this case, but not only that, to apply that rate so that the court can make the necessary comparison between the expenditures that were made in the actual world against the expenditures that would have been made in the non-breach world. And that was never done because there was never any evidence put in about what expenditures would have been made at the 1987 rate. Now, what we've been talking about is exclusively Plant Hatch. At Plant Vogel, there was no evidence whatsoever about what would have happened at the 1987 rate. And for that reason alone, remand is required. Now, what the plaintiffs say is that, well, the court did make some sort of finding that at the 1991 rate, a re-rack wouldn't have been necessary. But that's not the finding that the court made. And in fact, the court could not have made that conclusion. What the court found was that any expenditures that the court, that Southern Nuclear, would have made at the 1991 rate would have postdated the claim period in this case. And the plaintiffs themselves don't contend that at the 1991 rate, they wouldn't have been required to re-rack the pool at Plant Vogel. And in fact, the reason they don't do that is because Plant Vogel had no allocations whatsoever through the first 10 or so years of the program. They would have run out of space at Plant Vogel, and they needed to do something at the 1991 rate. Now, the government's position— I guess what you're arguing is that when our decisions came down indicating that you should use the 1987 rate, that that allows you to do a do-over and to reopen the record and put in additional evidence, right? No, I think actually it's precisely the opposite, Your Honor. I think that in Carolina Power, we argued that the plaintiff shouldn't be permitted to come back in and retry the case at the 1987 rate. And this court said, no, the plaintiffs are afforded that opportunity. Well, wait a minute a second. Who has the burden to say that alternative expenses would have been included? I would have thought that was the government's burden to do that. Respectfully, Your Honor, that's exactly the opposite conclusion as was stated in Yankee Atomic, where the court stated—and this is at page 1273 of the opinion— the plaintiffs had a burden to prove the contractual acceptance rate and apply that rate before suggesting that the government's breach was a substantial factor in causing the Yankees' claim damages. Without record evidence to be supplied by the plaintiff of the Yankees' condition with full government performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not assess the Yankees' damages. That is undressing the question I was raising. My recollection—I may be mistaken—is that in breach damage context, obviously the party claiming breach has the obligation to establish its damages, but I would have thought that the non-breaching party, if it's claiming an offset for other expenses that have been saved as a result of the assumed events, has the burden of establishing the saved costs. Now, have you looked at that question? Yes, Your Honor. And initially, as I said before, I think that is squarely addressed by Yankee. But there's also— Not in the part that you read. I don't see that. Well, in addition, there is some support for what the Court is saying with respect to reliance-type damages. But in the expectation context—and this comes out in the Blue Line cases— it is the plaintiff's burden to establish their condition in both the actual world and in the non-breach world so that the Court can make what I refer to, what the Yankee Court referred to, as the necessary comparison. If I can finish with respect to Plante-Vogel— Do you agree that if the burden was on you to talk—to establish the alternative expenses that would have been incurred that should be offset, if it was a burden on you to establish the offset expenses, that you didn't do that on this record? I would agree that we didn't do that. But I would not agree that the consequence of that is that no remand would be required. So you're saying that you have the right to reopen— that our cases give you the right to reopen the record and correct that deficiency, assuming it is a deficiency. I think, Your Honor, that's exactly what happened in Carolina Power. This is simply the flip side of it. In Carolina Power, the plaintiffs came in and said, well, we recognize that the case wasn't decided at the 87 rate, but we would like this Court to affirm, even though we didn't put on any evidence whatsoever about what would have happened at the 87 rate, we would nonetheless like the Court to affirm because the Court can make some kind of fact-based judgment that the same thing would have happened at the 87 rate. And the government said, no, you need to remand it. The Court needs to remand it so as to permit this to be fleshed out in discovery and for the Court to make the type of analysis that's required of these spent fuel cases. But where does it say that the record should be reopened? I know it says that it should do an analysis under the 1987 rate, but where does it say that the record should be reopened? Your Honor, in all candor, it's impossible not to reopen the record and to be able to do that. You're saying the 87 rates are on the record, but you're saying it's your position, Mr. Auerbach, that there is not a testimony speaking to the 87 rates with the specificity in which you say the case is required. That's exactly right, Judge Auerbach. And it's not just testimony. It's expert reports. It's discovery. It's ascertaining what the plaintiffs would have done. Let me ask you, if I could, switching gears a little bit, we have this other issue in the case, the unavoidable delay clause issue. Your contention is the Court of Federal Claims erred in saying that you had waived your arguments under that. Leaving aside, for the moment, the question of waiver, assume that you're correct, what kind of an argument does the government want to make under the unavoidable delay clause with respect to damages? Because it seems to me that that's a liability provision. And, you know, the cases, some of the cases in which you've cited, Pacific Gas, Yankee Atomic, and so forth, have addressed damages in this case in the traditional way, namely, you know, one of them cites to the restating of contracts and so forth. So what is the argument that the government wants to be able to make under the unavoidable delays clause with respect to damages? Is the court asking what specific factors would contribute to an unavoidable delays argument? Or rather, what the consequence of that might be? It seems pretty clear now in these cases that liability has been established. You go through all the cases, everyone agrees there's liability. So we're at the damages phase, okay? And I think in one of your, maybe it's the very end of the reply brief, you indicate that you want to be able to make, okay, here we go, page 25, very last sentence before the conclusion says, We have not yet had an opportunity to raise an argument based on the unavoidable delays clause. And as such, its applicability to DOEs, delay, and spent nuclear fuel acceptance has not yet been fully or fairly adjudicated. But our Nebraska power established that the decision of the D.C. Circuit was raised judicata. And there's no more argument to be made by the government with respect to liability under the liabilities of term. What argument does the government want to make under the unavoidable delays clause as it relates to damages? Your Honor, the text of the unavoidable delays clause indicates that the government shall not be liable for damages. Expectancy damages. Well, the term expectancy is not used, but that's certainly what we understand it to mean. And the government's position is and has been at the Court of Federal Claims in the wake of the NPP decision that we would like to be able to assert an unavoidable delays defense so as to preclude the plaintiffs from recovering damages solely for those expenditures that are incurred as a result of causes that arise out of an unavoidable delay. But isn't that our case? But like our cases, those, I mean, Yankee Atomic, Pacific Gas, Carolina, all have said, okay, the plaintiff is entitled to recover damages or expenses that incurred because of the government's failure to meet the 1998 online requirement. And all of those cases say that we have to examine the cases you've been citing in your discussion with Judge Dyke correctly point out that we have to look to the 87 ACRs and so forth. That's the regime under, are you saying that these damages cases should go under a different approach than that, which has been laid out in our cases? Your Honor, we're asserting this on a perspective basis, and we're not necessarily looking to undo the results of cases that have already been decided. But we do believe that we have a valid unavoidable delays defense that unfortunately we were not able to raise for a period of time. But I want to see how you have a delays respect to damages. This case proceeds under the traditional damages. The clause speaks of liability for damages. That's what all, basically, that's what always you have in a situation. Is someone liable for damages? Now, quite properly, I think you can make the various arguments that you've been making here. Are the damages properly computed and so forth? But what argument do you want to make that the unavoidable delay clause bars a damages claim? Again, this is the text of the unavoidable delays clause, which states that neither the government nor purchaser shall be liable under this contract for damages. Yeah, well, it says liable, and liability has been determined. Well, in all candidates, it says both. And I think a typical passage in this context might simply say the government shall not be liable. Why shouldn't, though, the government be liable for the type of damages that we've spelled out in the three cases that you were discussing with Judge Dyke? Well, again, this is presupposing that there is, in fact, an unavoidable delay. But in that circumstance, it's essentially a force majeure clause and an allocation of the risks by the parties in the event that circumstances come to pass that are beyond the party's control. We are seeking to invoke that type of force majeure clause and be able to argue that because the parties came to an agreement that the government would not be responsible for damages, and, as the text of the agreement says, the purchaser wouldn't be responsible for paying damages in the event that it somehow was recluded from performance. What data do you think say that it can or cannot? Your Honor, I think that the analysis in the NPP decision concerning the types of damages that are precluded by this clause is correct. Well, in NPPD, we only decided whether there was reach of sovereign immunity or whether the D.C. Circuit had overstepped its bounds. The concurrence properly added a cautionary instruction basically indicating damages are open, as the majority said. Well, I think what the concurrence said in the moment that the two members of the concurrence are in front of me was that, although the government would not be responsible for paying expectation damages, other remedies might be available to the plaintiffs, such as restitution. Plaintiffs have not asserted total breach in this case. This continues to be a partial breach case. And the remedy that they have sought in this case is mitigation damages, which are a form of expectation damages. Mr. Abramank, you've already used up all of your time, and we've asked you a lot of questions, and we'll restore your five minutes of rebuttal. But before you sit down, I want to just ask you very quickly to address the situation with respect to the plant Farley. Is that matter not contested? We do not seek remand with respect to the court's assessment of damages at plant Farley. We don't seek reversal of it. We don't have an issue with the court's conclusion there. And the basis for that is? The basis for that is- Can you mention why you're not contesting that or seeking a remand for that? We have performed a sanity check on what would have happened at the 1987 raid at plant Farley and recognize that at plant Farley, we can't in good faith make an argument that the result would have been any different. I would distinguish that from the two plants at which we have appealed, because we do believe that the result would be different. And at a minimum, we believe that a trial and discovery is necessary in order to ascertain whether or not the result would have been different. At plant Farley, we can't make an in good faith assessment. Thank you very much. Mr. Blanton. Good afternoon, Your Honor. May it please the court. My name is Stan Blanton. I represent Southern Dixon Operating Company. The reason they don't contest plant Farley is because the evidence was clear at trial, and the government conceded at trial, that there was no difference in terms of the ability of the plant to maintain adequate space in its pool, whether or not the 1991 annual capacity report or the 3,000 metric ton raid in the 2004 annual capacity report, or, in this case, the 2,650 acceptance rate contained in the 1987 annual capacity report that this court has adopted as the contractual rate, were applied and made no difference at plant Farley. The same thing as Judge Marrow illustrated in his opinion on reconsideration is true as to plant Hatch. This court held in Yankee and in CPNL that in these spent fuel cases where no acceptance rate is specified in the contract, that the trial court must analyze approximate cause using an acceptance rate. And this court in BG&E decided what that acceptance rate is. So the government says in Carolina Power the court said you have to do it over again because you didn't know that it was the 1987 rate, right? I mean, we didn't do that in Carolina Power. I agree that's what the government says, Carolina Power said. Isn't that what Carolina Power said? is that because the trial court did not analyze the condition of the pool under the 1987 rate, that that case had to be remanded in order for the trial court to perform that function and show what the basis of his findings were. And in the course of doing that, they rejected the government's argument that somehow CPNL had waived the ability to argue the rate that this court established as the contract rate because it argued a different rate at trial. Well, do you think that Carolina Power allowed Carolina Power to reopen the record and come with new evidence or not? I do not. And what is your basis for that? Can you show me some part of the opinion that foreclosed that? Well, Your Honor, the evidence upon which, the question of Carolina Power and Light was not what evidence was in the record. The 1987 rate was in the record. And all of the relevant elements of the analysis that the court did in Southern on the motion for reconsideration were also in the record. The discharges from the reactor, the inventory of the spent fuel pool, the amount of- Show me where in the opinion it says you don't need to reopen the record. I can't do that, Judge. I don't see that addressed one way or the other. Yeah, that's the problem. I don't see that one way or the other. Maybe there's a need for some expert commentary or some testimony as to the effects that would occur at that 87 rate. I don't think so, Your Honor. I'll tell you why. In Southern, it is true that the government modeled the 1991 rate and the plaintiffs modeled the 3000 rate. And those were, in essence, the two extremes of the reasonable rates. The issue being litigated in this trial was what is the, quote, reasonable rate under which the government should perform. We argued it should be 3000. They argued it should be 1991. But everything in between there was subject to being selected by the trial court, and we didn't know what he was going to select. For that reason, as the courts noted, we did put on evidence of these alternative fuel management techniques that could be used in case the court did not select our rate. And the government chose to not put any kind of evidence on that issue. But on reconsideration, what Judge Merrow did was analyze all of the evidence we did put in on the discharges from our reactor and the beginning inventory of our pool, none of which change based on what rate you apply. As of 1998, the planned discharges from the reactor, which were in evidence, and the 1998 pool inventory, which was in evidence, is the same regardless of whether you say now I'm going to analyze this under the 3000 rate or the 1987 rate. I mean, the government is saying it would be saved costs if you use the 1987 rate, and their failure to introduce evidence to that effect should be excused under Carolina power, and they ought to have a chance to go back and open the record, right? No, sir. I don't understand them to be saying that as to plant hatch. What I understand them to be saying under plant hatch is that the trial court assumed that Southern would have had to use these alternative fuel management techniques in order to maintain adequate space in its spent fuel pool, applying the 2650 rate in the 1987 ACR. Well, how's that different from what I've said? I mean, what they're saying is we didn't put any evidence in of the saved costs, and we're entitled to do that. Primarily because Judge Merrow did not, contrary to what they say, and I can read it to you from the opinion, Judge Merrow did not find that we would have had to use those alternative fuel management techniques in the context of the 2650 rate at plant hatch. I would prefer, if the court will look at, and the slide I have is 79 Federal Claims, page 142. It's at the top of the page, right above the chart that where Judge Merrow analyzes. Where's the appendix attached to the briefs? Page 74 of the appendix, Your Honor. 74, okay. And I'll just read the passage I'm referring to, right before he analyzes the 2650 rate at plant hatch. He says, these numbers are unadjusted by the 20% increase options, swaps, exchanges, or sales, or any of the fuel management techniques described at trial. And then when you look at the chart, you can see that using the acceptance allocations that go to plant hatch under the 2650 rate, and nothing more. That adequate space is maintained in that split fuel pool for plant hatch to be able to discharge a full core from the reactor without any augmentation using any of these alternative fuel management techniques that the government now wants to reopen the record to introduce evidence on. So they're irrelevant to plant hatch. Your Honor, isn't that the most careful approach here to send it back to the Court of Federal Claims? You know, because we do seem to have been pretty specific in those three cases Mr. Haberbach was discussing. And basically say, okay, let the parties argue as to whether additional evidence is necessary. Let the court decide, and then have the court decide. Isn't that the most careful, thorough approach under which there'll be no questions or uncertainties? Your Honor, that's a great question. And after, but. After seven years. That wasn't such a great question. After, I would submit that after seven years. That's fair enough. After seven years of litigation, which is the amount of discovery and trial time before we had the trial in this case. And given that the trial court on reconsideration did exactly what this court said do in Yankee and Carolina Power and Light. Which is apply the condition of the plant hatch pool under the 2650 rate. There is simply nothing left to try unless you remand it to allow the government to put in evidence it chose not to put in at trial. And I would suggest to you that nothing prevented the government. But the 87 ACR isn't always. We're talking about 1998 through 2004. And the 87 ACR doesn't get to 2650 until 2004. Is that right? That's right. But Your Honor, in the analysis that the trial court did on the motion for reconsideration that you're looking at there. If you've got the opinion open to it. Yeah, sure. It takes the acceptance allocations from that 1987 ACR to plant hatch. The exact acceptance allocations that the government put in that annual capacity report. Where is that exactly in the chart? Because I was, in other words, where are the acceptance, I mean, in other words, are you saying that some of these numbers here represent parts, say for 1998, part of the 1200? Yes, sir. That's what I'm saying. See the column that says DOE pickup DX63? Right. DX63, if my memory serves correctly, is the 1987 mission plan amendment which has the 1987 annual capacity report embedded in it. Now, these annual capacity reports have the aggregate pickup rate, which is the rate that ramps up from 1200 to 2000 to 2650. Right. But for each one of those years, they also have divided that 1200, 2000, 2650 into acceptance allocations on a plant by plant basis. So the trial court was able to take it. But in 1998, hatch wasn't going to get anything away. Is this hatch? This is hatch. Hatch wasn't going to get anything picked up from it. Correct. And the trial court assumed it was not going to get anything picked up from it. That's what this analysis says. And in 2000, when the government was picking up probably, again, I don't have it committed to memory, but I think it's 1200 metric tons a year, plant hatch had 28 assemblies that the government was going to come pick up. And so on. And so the trial court had all of that evidence in the record after this trial was over. So it had all the evidence it needed in order to make the calculation that the court did not make in CPNL to say if the government was performing, in 2000 the government would have come and picked up 28 assemblies from plant hatch. And that would have had the following impact on the inventory and the spent fuel pool given the discharges and the spent fuel inventories that were in the record. I'm not sure what your point is. Is your point that the 1987 rate was litigated here and therefore caroline power doesn't apply or are you making some other point? My point is that the 87 rate was in the record and all of the other relevant facts needed for the court to make this analysis were in the record. So to the extent that means it was litigated, it was litigated, even though we didn't bother. The government says that it didn't put in and now wants the opportunity to put in evidence that it didn't put in before about safe costs, right? That's what they're saying, exactly. And I'm saying that there's no order excluding that evidence from the government. I mean, I agree. But the question is, does caroline power say, you know, because we changed the law, people get to do what they want? That's the question. Maybe you think that's a bad idea, but if that's what caroline power said, we're stuck with it. I agree that you're stuck with whatever caroline power said. That's not what caroline power says. What caroline power says is in order for the court to have rendered a finding of fact that the damages were caused by the government's breach, the court had to have analyzed the damages under the correct rate, which was the rate selected in PG&E, and which is the rate Judge Merrill on page 142 of this opinion and on page 74 of the appendix used to analyze plant hatch. Where's the plant voctel analysis? There is no, the trial court did not specifically analyze plant Vogel using the 2650 rate. That's correct. The fact of the matter is that during the period of time this trial covered, the acceptance allocations, the column under DX63, were all zero for plant Vogel. It's a relatively new plant, so it didn't have any acceptance allocations under either rate. So there's no delta. There's no difference. There wouldn't be no difference between in the period 1998 through 2004 on plant Vogel. The only time you get to a difference between the 2650 rate and the 3000 metric ton rate or any other rate as to plant Vogel is after the period of time this trial covered, which is often 2007-2008. What exactly is the difference between the chart at 141 and 142? The chart at 141, remember the government's motion for reconsideration, and I'm about to run out of time, Your Honor. No, that's all right. You can continue. The government's motion for reconsideration attacked or challenged Judge Merrow's finding that the plaintiffs would not have added dry storage even had the government performed at the 1991-900 ACR rate. The first chart is Judge Merrow's analysis of the pool inventories using that 1991 rate, which never gets above 900 metric tons a year. That is where Judge Merrow said they would have accommodated any shortfalls in full core reserve in that pool by using these alternative fuel management techniques. He did not make that finding with respect to the 2650 rate. He held clearly at page 142 of this opinion that under the 2650 rate, you would not have had to use any alternative fuel management techniques in order to maintain the adequate amount of space in the pool. All right. Thank you very much.  Mr. Abrobach, any rebuttal? Yes, Your Honor. Thank you. I'd like to start with a point that Mr. Blanton left off with, and that's the assertion that the court found that spent fuel management techniques would not have been required at the 1987 rate. Mr. Blanton's conclusion that Mr. Blanton draws and that he cites on page 24 of his brief was that if non-breach performance were to involve use of the MRS, Monitored Retrieval Storage Facility, in conjunction with a repository, that's essentially at the 87 rate, Plant Hatch had sufficient pool space to obviate any need for dry storage. That's the quotation that Southern relies upon in his brief. Two sentences before that, the court states, and Southern doesn't mention this, the court credits and credited testimony that with sufficient lead time in the non-breach world and with fuel management, burn-up adjustments, swaps, increase in pickups, etc., given the enormous expense necessary to build a dry storage facility for a relatively small amount of SNF, dry storage would not have been built at Plant Hatch. It's exactly the steps that the court credited testimony about that would have been necessary in the non-breach world. And in fact, I think the court's conclusion that dry storage would not have been necessary at 1987 is premised upon his conclusion that these steps would have been undertaken. But as the court has recognized, those steps have costs and those costs were never considered. Again, the court made its decision prior to Yankee and without knowledge that this court's decision in Yankee was going to say that we have to measure the actual expenses against the financial condition in the non-breach world. And the financial condition in the non-breach world includes the expenditures that the plaintiff did not undertake as a result of DOE's non-performance. I think it's instructive to look at the type of factual analysis required at each— Do you agree or disagree with his discussion of what that shows? I realize that you apparently are saying that there's more to the story, but do you agree with his description of what that chart shows? No, Your Honor. What that chart shows is an extraordinarily simplistic depiction of what might have happened at the 87 rate without the benefit of the pages and pages of expert testimony from nuclear engineers, from a plaintiff's own expert. And what I was going to mention a moment ago, if we look at page 1432 of the appendix, there are no fewer than 13— 1432? 1432. This is in Volume 3. There are no fewer than 13 pages devoted to demonstrative exhibits reflecting the analysis that plaintiff's experts engaged in in order to ascertain the type of—how many assemblies would have been loaded by DOE and what the effect of that would have been on plaintiff's S&F management. I'm still troubled by the fact that you didn't introduce these evidence of saved costs using the 1991 acceptance rates. Again, the government's position—and we will continue to state this—is that at the 1991 rate, there wouldn't have been saved costs because every single dollar that the plaintiff spent to construct a dry storage facility would have been expended in the non-breach will. There weren't costs avoided to obviate the need for dry storage at what the government's conception of— So the saved costs in your view only existed under the 1987 rate? Well, the saved costs—what the Court refers to as the saved costs are the costs necessary to obviate the need for dry storage. As I think I stated earlier, we don't contest on remand that in the non-breach world at the 1987 rate that the plaintiffs wouldn't have had to build dry storage, but we do assert that there would have been expenditures. And that's a different situation than the matter in which the case was tried based upon the 1991 rate and the rate that the plaintiffs advocated. Expenditures that were obviated by the construction of the additional storage facility. Correct, Your Honor. In the non-breach world, the government's position is that you wouldn't be obviating dry storage, you'd be building dry storage. And if you're building dry storage, you don't need to take the steps to obviate dry storage. The pages I was referring to in the record indicate the type of analysis that needs to go into the record in order for the Court to make a determination of what steps would have been undertaken in the non-breach will. It's not just that there was no evidence of that. There was no discovery of that. There was no expert testimony of that. In Carolina Power, this Court recognized that this is a profoundly factual endeavor. And it is a profoundly factual endeavor, one that relates to specific amounts of spent fuel, specific amounts of fuel that the Department of Energy would have picked up in the non-breach world, and the fact that if there's only one extra assembly out there, a lot of money has to be spent in order to accommodate it. Accommodation has costs, and this trial court made an error in not factoring in the cost of accommodation. And that's what we see agreement for with respect to the plan. All right, Mr. Auerbach, thank you very much. I thank both counsel. The case is submitted.